Cratsley, J.
Plaintiffs, Judith Borne (“Borne”), Sally Brochetti (“Brochetti”), Diana Cordner (“Cordner”), Pamela Dean (“Dean”), Cindy Johnston (“Johnston”), Lorna Kimball (“Kimball”), Linda Letendre (“Letendre”), Karen Richardson (“Richardson”), Maria Torrisi (“Torrisi”), and the Commonwealth of Massachusetts (“Commonwealth”) brought claims of sex discrimination under G.L.c. 272, §§92A, 98 and G.L.c. 15IB, and a claim of breach of implied covenant of good faith and fair dealing against the defendant, The Haverhill Golf and Country Club, Inc. (the “Club”). These claims were tried before a jury in October 1999. The plaintiffs and the Commonwealth were successful on all claims. Prior to the case going to the jury, the defendant filed a motion seeking to have the jury decide as a question of fact whether or not allegedly discriminatory actions and treatment by the Club regarding the plaintiffs prior to February 10, 1995 were barred by the applicable statute of limitations.[1] Under G.L.c. 151B, §5 plaintiffs must file their complaint with the Massachusetts Commission against Discrimination (“MCAD”) within six months of the discriminatory acts for it to be timely filed. The plaintiffs filed their complaint with MCAD on August 10, 1995, so the statute of limitations extends back to February 10, 1995. For the reasons given below, the defendant’s motion is DENIED, and all plaintiffs may describe to the jury what they experienced prior to February 10, 1995.

TRIAL EVIDENCE

The following evidence was developed during the trial:
The Haverhill Golf and Country Club, Inc. was organized in 1951. See Exhibit #107, Articles of Organization. The Club’s By-Laws govern club management and delegate to the Board of Governors the right to establish and change the Club’s rules and regulations, written or otherwise, regarding all aspects of the Club, such as membership, tournaments, tee times, and use of club facilities. See Exhibit #11, By-Laws, The Haverhill Golf and Country Club, Inc. Some of these responsibilities are performed by the Membership Committee, the Rules Committee, the Finance Committee, and the Golf and Tournament Committee. See Exhibit #11, By-Laws, The Haverhill Golf and Country Club, Inc.
In 1990 the Club changed the name of some of its categories of membership which had previously been gender specific. Intermediate man memberships became intermediate memberships, and single man memberships became primary memberships. Single woman memberships became limited memberships. Man and wife memberships became family memberships. See Exhibit #1, President’s Newsletter, January 1, 1990.
Currently, there are several categories of membership. There are primary memberships which give the *86 member a golfing membership with no tee time restrictions. The primary member is required to purchase a bond for $250.00, to pay a one-time initiation fee, and to pay required monthly dining room charges. See Exhibit #1, President’s Newsletter, January 1, 1990. The Club maintains a waiting list for primary memberships. See Exhibits #48, Waiting List, undated, Exhibit #74, Waiting List, undated, and Exhibit #101, Waiting List, July 1997. The Club limits the number of primary members to approximately 320. See Exhibit #10, Board of Governor’s Meeting Minutes, February 16, 1995. As of March 23, 1995 there were approximately four women who were primary members. See Exhibit #73, Membership Summaries. There are limited memberships which give the member a golfing membership with tee time restrictions. The one-time initiation fee, the annual dues, and the required monthly dining room charges for limited members are less than those for primary members. See Exhibit #1, President’s Newsletter, January 1, 1990. There are family memberships which consist of one primary membership and one limited membership. See Exhibit #72, Membership Rates, 1990-1995. Junior memberships may be attached to a family membership, if there are children in the family under the age of twenty-three who play golf. The majority of junior members are male. See Exhibit #63, Month-by-Month Changes in Membership. Additional fees for the junior members are then paid by that family. See Exhibit #72, Membership Rates, 1990-1995. If a junior attached to a family membership elects to become a full member within two years of eligibility, then the junior is exempt from paying any initiation fee in place at the time of transfer. See Exhibit #17, Board of Governor’s Meeting Minutes, March 1, 1990.
There are also pool, social, and corporate social memberships. See Exhibit #72, Membership Rates, 1990-1995. Intermediate members are between the ages of 23-25. They can have individual or family memberships at the primary or limited level as well as social or pool memberships at reduced rates. See Exhibit #72, Membership Rates, 1990-1995. Members who are 72 years of age or older and have been members of the Club for several years in good standing can have individual or family memberships at the primary or limited level as well as social or pool memberships at reduced rates. See Exhibit #72, Membership Rates, 1990-1995.
Primary members have no tee time restrictions. See Exhibit #1, President’s Newsletter, January 1, 1990. Limited members are not allowed to tee off from 10 a.m. to 2 p.m. on Wednesdays. See Exhibit #1, President’s Newsletter, January 1, 1990. From 1990 to August 1993 limited members were generally excluded from tee times before 1 p.m. on Saturdays, Sundays, or holidays. However, they were allowed to sign up for tee times after 11:45 a.m. and before 1p.m. if those times had not been reserved by primary members. See Testimony of Sally Brochetti, September 29, 1999. In August 1993 the Board of Governors voted a new rule regarding weekday tee times. Primary members could reserve their tee times 48 hours in advance, but limited members could only reserve their tee times 24 hours in advance. See Exhibits #40 and #44, Board of Governor’s Meeting Minutes, August 26, 1993. This rule was revoked six months later in February 1994. See Exhibit #75, President’s Newsletter, April 1, 1994. In the spring of 1994 limited members were told that they could not tee off on Fridays from 11 a.m. to 2 p.m. and before 12:46 p.m. on weekends and holidays. See Testimony of Sally Brochetti, September 29, 1999. There was also a decision to open the course earlier on Saturdays, Sundays, and holidays. It would open at 7:42 a.m., but all tee times before 8:06 a.m. would be reserved for primary members only. See Exhibit #75, President’s Newsletter, April 1, 1994. Junior members were not to tee off before 2 p.m. on weekdays and 3 p.m. on weekends and holidays. See Exhibit #4, Board of Governor’s Meeting Minutes, November 17, 1994.
In the spring of 1995 the golf pro was given the discretion by the Golf and Tournament Committee to allow limited members to tee off on weekends at tee times reserved for primary members provided those tee times were empty. The golf pro also allowed a limited male member to tee off on Wednesday afternoons during primary times and junior male members to play during times restricted to primary members. See Testimony of Thomas Dufresne, October 20, 1999, Exhibit #4, Board of Governor’s Meeting Minutes, November 17, 1994.
Several golfing tournaments occur each year. Some are run by the Women’s Division and some are Primary Tournaments. See Exhibit #103, Directories of the Women’s Division, 1992-1995. No women play in Primary Tournaments including women with primary memberships. See Exhibit #2, President’s Newsletter, February 1, 1990.
In the Clubhouse there is a grill room called the 19th Hole which has been open to both men and women since 1990. See Testimony of Sally Brochetti, September 29, 1999. In 1995 there was also a Ladies’ Lounge, and a Men’s Card Room. See Exhibit #10, Board of Governor’s Meeting Minutes, February 16, 1995. Women were discouraged from entering the Men’s Card Room. See Testimony of Sally Brochetti, September 30, 1999 and Testimony of Volker F. Wrampe, General Manager of the Club from 1994— 1995, October 7, 1999. Three function rooms are rented out to the public for banquets and meetings. See Exhibit #109, Haverhill Country Club Web Page.
DISCUSSION
A complaint must be filed with the MCAD within six months of the alleged discriminatory act in order to be timely filed under the statute. G.L.c. 151B, §5 However, this six month limitation is not applied when the acts of discrimination are considered to be of a con *87 tinuing nature. 804 Code Mass. Regs. 1.03(2), Lynn Teachers Union. Local 1037 v. Against Massachusetts Commission Discrimination, 407 Mass. 515, 520 (1990), Provencher v. CVS Pharmacy Division of Melville Corp., 145 F.3d 5, 14 (1st Cir. 1998). Massachusetts law does not clearly explain the factors and tests involved in determining whether or not there have been continuing violations, so it is helpful to look to federal law for guidance. While Massachusetts courts are not bound by the federal courts’ interpretations of the relevant federal statutes, the Supreme Judicial Court has indicated that it may consider analogous federal statutes when interpreting Massachusetts statutes. Lynn Teachers Union at 521 n.7.
Continuing violations may be either systemic or serial. Lawton v. State Mut. Assur. Co., 101 F.3d 218, 221 (1st Cir. 1996). A “systemic violation has its roots in a discriminatory policy or practice; so long as the policy or practice itself continues into the limitations period, a challenger may be deemed to have filed a timely complaint.” Pilgrim v. Trustees of Tufts College, 118 F.3d 864, 869 (1st Cir. 1997), citing Jensen v. Frank, 912 F.2d 517, 523 (1st Cir. 1990). For a systemic violation claim there does not have to be an anchor act of discrimination occurring within the six month limitation period. Provencher at 14.
A serial violation claim is “composed of a number of discriminatory acts emanating from the same discriminatory animus, each act constituting a separate wrong actionable under Title VII.” Jensen at 522. A serial claim violation does require “some violation within the statute of limitations that anchors the earlier claims.” Id. Furthermore, the anchor act occurring within the statute of limitations must be a separate discriminatory act, not just the “residual effects of past discriminatory conduct,” that predated the limitations period. Id. In addition, there must be a substantial relationship between the anchor act and those discriminatory acts antedating the limitations period. Sabree v. United Broth. Of Carpenters and Joiners, 921 F.2d 396, 401 (1st Cir. 1990), citing Berry v. Board of Supervisors of L.S.U., 715 F.2d 971, 981 (5th Cir. 1983). While the Fifth Circuit identified three factors to consider, subject matter, frequency, and degree of permanence, they consider the third factor, degree of permanence, to be the most important. Berry at 981. The First Circuit also considers this factor to be the most important and defines it as an inquiry into when the plaintiff knew or should have known (s)he was being discriminated against. Sabree at 402.
In the present case the actions of the Club regarding membership transfers, tournaments, tee times, and use of club facilities are those under consideration. To resolve the defendant’s statute of limitations claim, it is necessary to determine if those Club actions which predate the limitations period are connected to those within the limitations period as continuing violations of a systemic and/or serial nature.
I. SYSTEMIC CONTINUING VIOLATIONS
It is this Court’s opinion that sufficient evidence was developed during trial to establish that the Club engaged in continuing violations of a systemic nature in all four areas, membership transfers, tournaments, tee times, and use of club facilities. Regarding membership there is evidence that the Club allowed transfers from one category to another category both within and without the limitations’ period. Juniors could transfer from their family membership and become intermediate members at the primary or limited level while they were 23, 24, and 25 years of age. Then they could become regular primary or limited members. Limited members of any age could apply to become primary members.
However, both within and without the limitations’ period there were different criteria for men and women as they applied for these changes. Junior members were by definition part of a family membership, and the majority were male. The Club did not ask them to pay any initiation fee when they were offered intermediate primary or regular primary membership within two years of eligibility. On the other hand, limited women members who were frequently part of a family membership were asked by the Club to pay an initiation fee when they were offered primary membership. Further, the amount of the initiation fee being requested kept changing. Outside the limitations period it was one quarter of the initiation fee being charged at that time. See Exhibit #4, Board of Governors Meeting Minutes, November 17, 1994. Within the limitations period it was the total initiation fee being charged at the time primary membership was offered. The defendant did not rebut this evidence during trial, and it demonstrates a continuing discriminatory practice within and without the limitations’ period by the Club regarding membership transfers.
Regarding tournaments there is evidence that the Club held Primary Tournaments outside the six months limitations period from which primary women were excluded and continued this practice within the limitations’ period. The defendants did not give any legitimate non-discriminatory reasons for this exclusionary practice, such as the women having handicaps which were too high for them to be competitive with the men. They admitted that the Club’s continuing policy was that only male primary members could play in Primary Tournaments within and without the limitations period. See Exhibit #2, President’s Newsletter, February 1, 1990. Therefore, there is adequate evidence that the Club engaged in a continuing discriminatory practice of a systemic nature regarding tournaments.
Regarding tee times there was evidence during trial that the Club restricted blocks of tee times on some days for exclusive use by primary members prior to and during the limitations’ period. See Testimony of Sally Brochetti, September 29, 1999 and Exhibit #75, *88 President’s Newsletter, April 1, 1994. Assuming that this discrimination was based on membership categories, and not on gender, it was not per se unlawful. However, there is evidence that exceptions to this policy occurred both without and within the limitations’ period that were gender specific. In April 1995 the Golf and Tournament Committee authorized the golf pro to use his discretion to allow limited members to tee off during primary times on weekends. Typically, he allowed them to tee off in the late morning. However, he also allowed a limited male member to play during primary time on Wednesdays, and he allowed junior male members to play during primary times on Wednesdays and Fridays, as well as early on weekend mornings. He did not extend these privileges to limited female members and to junior female members. The golf pro was an employee of The Haverhill Golf and Country Club, Inc., and thus he was an agent for and acting on behalf of the Club when he authorized those exceptions to the Club’s tee time policies. Therefore, his discretionary actions both within and without the limitations’ period were a continuing pattern and practice of treating limited female members and junior female members differently from limited male and junior male members regarding tee times.
Regarding use of club facilities there was evidence during trial that the Club maintained a Card Room outside the limitations period that women members were discouraged from entering. Sally Brochetti, one of the plaintiffs, testified that in 1993 or 1994 she was told not to come in the Card Room by David Leahy, who was on the Rules Committee in 1994. See Testimony of Sally Brochetti, September 30, 1999. Volker F. Wrampe also testified that he was told by Club President, Ted Vitas, to try to keep women out of the Card Room when he started his job as General Manager in late October 1994. Wrampe testified that when he was taking a prospective female club member on a clubhouse tour and she opened the door of the Card Room to look inside the card playing stopped and the men stared at her. See Testimony of Volker F. Wrampe, October 7, 1999. The defense did argue during trial that David Leahy and the men in the card room were not officially representing the Club when they reacted negatively towards a woman’s presence in the Card Room. However, Mr. Vitas, as President, did officially represent the Club, and neither the defense nor Mr. Vitas ever asserted that Mr. Vitas did not make that statement to Mr. Wrampe. Therefore, there is sufficient evidence that the Club did engage in the practice of discouraging women from entering the Card Room outside the limitations’ period. By referring to the Card Room as the Men’s Card Room in the Board of Governor’s Meeting Minutes dated February 16, 1995, the Club engaged in the same practice within the limitations’ period. Therefore, there is evidence of continuing violations of a systemic nature regarding the use of club facilities.
H. SERIAL CONTINUING VIOLATIONS
The actions of the Club also constituted continuing violations of a serial nature in two of the four areas under consideration, tournaments and use of club facilities. Since the Club admitted that Primary Tournaments were only for primary male members, any of the Primary Tournaments held between April 1995 and August 10, 1995 constitute an anchor act of alleged sex discrimination within the limitations’ period. Since the Club also admitted that the exclusion of primary women members from Primary Tournaments had been their policy since 1990, the Club committed repeated acts of sex discrimination of a serial nature.
Regarding the use of club facilities, the identification of the Card Room as the Men’s Card Room in the February 16, 1995 Board of Governor’s Meeting Minutes constitutes an anchor act of sex discrimination within the limitations’ period. The testimony recited above by plaintiffs’ witnesses and defendant’s limited rebuttal of this testimony indicates that there was some evidence that women were discouraged from entering the Card Room outside the limitations’ period. Therefore, the Club engaged in continuing violations of a serial nature regarding use of the Card Room both within and without the limitations’ period.
The law is unclear if continuing violations of a serial nature in two of the four areas, tournaments and the use of club facilities, are sufficient to assume that there are continuing violations of a serial nature in all four areas under consideration. However, there is ample evidence that there are continuing violations of a systemic nature in all four areas. Therefore, as a matter of law, testimony regarding the alleged discriminatory actions of The Haverhill Golf and Country Club, Inc. regarding memberships, transfers, tournaments, tee times, and use of club facilities during the time period discussed during trial, from 1990 to August 10, 1995, is not barred by the statute of limitations.

ORDER

For the foregoing reasons, the defendant’s motion for limitation of action is DENIED.

Justice Kottmyer of this Court in her Summary Judgment decision dated September 16, 1999 gave a preliminary ruling that the application of the applicable statute of limitations to one or more of the plaintiffs involved issues of fact. After hearing all of the evidence during this trial, this Court does not believe that any such issues of fact exist and rules, as a matter of law, that all plaintiffs may relate to the jury alleged acts of discrimination occurring to them after 1990 and prior to February 10, 1995.